Aaron L. Renfro, Bar No. 255086
  arenfro@calljensen.com
L. Lisa Sandoval, Bar No. 310380
  lsandoval@calljensen.com
CALL & JENSEN
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
Tel:    (949) 717-3000

Attorneys for Plaintiff Ten-X, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEN-X, LLC, a Delaware limited liability company, | Case No.  8:23-CV-00200 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| RATIONAL REAL ESTATE XII, LLC, a New Jersey limited liability company; and DOES 1 through 10, | |
| Defendants. | |

Plaintiff Ten-X, LLC ("Ten-X" or "Plaintiff"), by and through its attorneys, brings this Complaint against Defendant Rational Real Estate XII, LLC ("Rational Real Estate" or "RRE"), and alleges as follows:

## NATURE OF ACTION

1.     This is an action brought by Ten-X, an online commercial real estate exchange, against Rational Real Estate ("RRE"), for refusing to pay Ten-X for Ten-X's marketing and auction services.

2.     On July 5, 2022, RRE retained Ten-X to market and auction a multi-family use building located in Trenton, New Jersey.  Over the next two months, Ten-X worked diligently to market RRE's property, procuring qualified bidders. Then, on the eve of the scheduled auction, RRE abruptly withdrew in breach of its contractual obligations.

3.     Perhaps not surprisingly, after gaining the benefit of all of Ten-X's work to market the property, RRE proceeded to sell the property outside the bounds of Ten-X's services, in a blatant attempt to prevent Ten-X from earning its contractually agreed upon fee.

4.     Ten-X has contacted RRE multiple times to secure it's contractually agreed upon fees, but RRE has refused to even respond. Ten-X has therefore been forced to file this lawsuit, and when it succeeds, RRE will owe not only Ten-X's marketing fees but its attorneys' fees and costs, as well.

## PARTIES

5.     Plaintiff Ten-X is a Delaware limited liability company with its principal place of business in Irvine, California.

6.     Upon information and belief, Defendant RRE is a limited liability company organized and existing under the laws of the State of New Jersey with its principal place of business located at 60 S. Munn Ave., East Orange, New Jersey 07018.

7.      Ten-X is unaware of the true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 to 10. Ten-X sues these Defendants under their fictitious names "DOE." Ten-X believes and is informed, and on that basis alleges, that each of the DOE Defendants is in some manner legally responsible for the acts and occurrences alleged, and that each DOE Defendant is therefore liable to Ten-X as alleged herein. Ten-X will seek leave of Court to amend this Complaint to set forth the true names and capacities of these fictitiously named Defendants when they are ascertained.

8.      Ten-X is informed and believes, and on that basis alleges, that at all relevant times, Defendant and DOES 1 through 10, and each of them, was the principal, agent, servant, employee, co-conspirator, alter ego, joint venturer, shareholder, investor, independent contractor, and/or designated representative of the remaining defendants, and in doing the things alleged was acting within the course and scope of their agency, agreement, employment, conspiracy, joint ventureship and/or alter ego relationship, and in furtherance of this agency, agreement, employment, conspiracy, joint ventureship and/or alter ego relationship, and with the full knowledge, approval, agreement, permission, consent, ratification, either express or implied, of each of the remaining defendants, including Defendant and DOES 1 through 20, and each of them.

## JURISDICTION & VENUE

9.      This Court has original jurisdiction under 28 U.S.C. § 1332 because the parties are each citizens of different states, and the controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     Venue is proper in this district because a binding and enforceable written agreement provides the action must be brought in a court located in Orange County, California. That agreement further provides that RRE irrevocably consents to the venue of this Court. In addition, a substantial part of the events giving rise to Ten-X's claims

for relief against RRE occurred in the County of Orange, California, and upon information and belief, RRE has sufficient contacts with the State of California.

11.    This Court has personal jurisdiction over RRE because a binding and enforceable written agreement that RRE executed provides that RRE irrevocably consents to the personal jurisdiction of this Court.

## FACTUAL ALLEGATIONS

12.    Ten-X is an online commercial real estate marketplace that allows buyers, sellers, and real estate professionals to search, list, and transact commercial properties online.

13.    On or about July 5, 2022, RRE solicited and retained Ten-X for online real estate sales assistance to sell RRE's commercial property located at 507 Grand St., Trenton, New Jersey 08611. Attached as **Exhibit A** is fully executed Ten-X Marketing Agreement ("Agreement"), dated July 4, 2022.

14.    Upon information and belief, the property located at 507 Grand St. is called the Grand Court Villas, which is a 63-unit loft-style apartment building. Upon information and belief, the property housing the Grand Court Villas was built in the early 1930's by La Corona Cigar Company for the manufacturing and distribution of cigars, and was remodeled for multi-family use as a Spanish Colonial Revival.

15.    On or about July 5, 2022, RRE agreed to target August 22, 2022, as the date to auction the Grand Court Villas on Ten-X's website.

16.    Over the following weeks, RRE exchanged multiple emails with Ten-X's sales team to plan to the upcoming auction.

17.    On or about August 18, 2022, Joshua Kahr, Managing Member of RRE, emailed Ten-X demanding that the auction go forward on August 22, 2022 as originally planned, stating, "[b]ased on timing and other factors, we cannot extend the auction date."

18.     On or about Friday, August 19, 2022, Kahr emailed Ten-X, inquiring how to view on Ten-X's auction website the proof of funds for each bidder. Evan Koransky, Senior Director at Ten-X explained to Kahr, "[o]nce you click on each buyer you will [see] the [proof of funds] on the left side."

19.     Koransky's August 19 email to Kahr included a screenshot for one of the potential bidders who had viewed the Grand Court Villas listing. That buyer had shown proof of funds in the amount of $12,849,791 with more than $25 million in assets under management.

20.     Then, on Sunday, August 21, 2022—the day prior to the scheduled auction—RRE's attorney abruptly demanded that Ten-X remove 507 Grand Street from the auction.

21.     Pursuant to the agreed terms, RRE therefore owes Ten-X a withdrawal fee. Specifically, under section 3(a), RRE agreed that if RRE "withdraws a Property from an Auction or the Ten-X website during the Marketing Period . . ., Seller shall immediately pay Ten-X (i) 50% of the Withdrawal Fee if the withdrawal occurs more than 30 day before the start of the first scheduled auction date, or (ii) 100% of the Withdrawal Fee if the withdrawal occurs anytime thereafter."

22.     The Agreement further specified that the Withdrawal Fee would be calculated as the Transaction Fee that would be applicable to a sale at the Initial Reserve Price (i.e., the floor price set for the auction).

23.     Here, the Reserve was set at $9 million, and the Agreement specified that the Transaction Fee would amount to 2.25% of that price, equaling $202,500.00.

24.     After withdrawing from the auction, RRE refused to pay the withdrawal fee, falsely claiming that Ten-X had failed to secure qualified bidders.

25.     On information and belief, RRE withdrew from the auction because RRE had identified a buyer for the Grand Court Villas and wanted to avoid paying Ten-X's transaction fee for Ten-X's services over the previous month and a half.

26.     On information and belief, on or about November 17, 2022, RRE's real estate agent, CBRE, sent out a press release announcing the sale of the Grand Court Villas, bypassing Ten-X's auction. RRE sold the Grand Court Villas to another buyer, after utilizing all of Ten-X's marketing services and procurement of qualified bidders.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

#### *(Against RRE and DOES 1 to 10)*

27.     Ten-X restates and incorporates paragraphs 1 through 26 as though fully set forth herein.

28.     On or about July 5, 2022, Ten-X and RRE entered into a fully executed Agreement.

29.     RRE covenanted that the "Agreement is subject to the Ten-X Marketing Agreement, Standard Terms" ("Standard Terms"), and therefore agreed to all of the Standard Terms. The Standard Terms, which are incorporated into the Agreement, are attached as **Exhibit B**.

30.     The Agreement and Standard Terms are valid and enforceable contracts.

31.     Under section 3(a) of the Standard Terms, "[i]f Seller withdraws a Property from an Auction or the Ten-X website during the Marketing Period . . ., Seller shall immediately pay Ten-X (i) 50% of the Withdrawal Fee if the withdrawal occurs more than 30 days before the start of the first scheduled auction date, or (ii) 100% of the Withdrawal Fee if the withdrawal occurs anytime thereafter."

32.     RRE agreed that Ten-X would market the Grand Court Villas from July 5, 2022 to September 3, 2022 ("Marketing Period").

33.     Under section II(b) of the Agreement, if RRE withdrew from the auction, the Withdrawal Fee is "[a]n amount equal to the Transaction Fee that would be applicable to a sale at the initial Reserve Price."

34.     Pursuant to the Agreement, RRE agreed to pay Ten-X a transaction fee of 2.25% based upon the $9 million Reserve Price.

35.     RRE, however, refused to pay the invoice that Ten-X issued to RRE for the Withdrawal Fee and for reimbursement of Ten-X's expenses in obtaining third-party reports in anticipation of the auction.

36.     Ten-X performed all, or substantially all, of its obligations under the contracts by preparing to auction the Grand Court Villas.

37.     RRE breached the Agreement by failing to pay the Withdrawal Fee or reimburse Ten-X for the third party reports for the auction.

38.     RRE owes an outstanding balance of at least $206,500 for its breach of contract with Ten-X.

39.     As a direct and proximate cause of RRE's breaches, Ten-X was damaged by an amount to be proven at trial, but in no event less than the jurisdictional limits of this court, and attorney's fees and costs.

## SECOND CAUSE OF ACTION
### (Common Count: Open Book Account)
### *(Against RRE and DOES 1 to 10)*

40.     Ten-X restates and incorporates paragraphs 1 through 39 as though fully set forth herein.

41.     Ten-X and RRE engaged in financial transactions with each other establishing the relationship of creditor and debtor. In the course of their business dealings, RRE retained Ten-X's marketing services, and Ten-X provided those services to RRE.

42.     Ten-X kept an account of the debits and credits involved in each of the transactions with RRE.

43.     RRE owes Ten-X money on the account. RRE has failed to pay the full amount owed to Ten-X, even after Ten-X demanded payment.

44.    The outstanding balance remains due and unpaid by RRE in the amount of at least $206,500.

## THIRD CAUSE OF ACTION

### (Common Count: Account Stated)

### *(Against RRE and DOES 1 to 10)*

45.    Ten-X restates and incorporates paragraphs 1 through 44 as though fully set forth herein.

46.    RRE owed Ten-X money from previous financial transactions. In the course of their business dealings, RRE retained Ten-X's marketing services, and Ten-X provided those services to RRE.

47.    Ten-X and RRE, through their conduct, agreed that the amount stated in the account was the correct amount owed to Ten-X.

48.    RRE, through its words and conduct of preparing for the auction scheduled on August 22, 2022, promised to pay the stated amount to Ten-X.

49.    RRE has not paid the total amount owed under this account.

50.    RRE owes Ten-X at least $206,500.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

### *(Against RRE and DOES 1 to 10)*

51.    Ten-X restates and incorporates paragraphs 1 through 50 as though fully set forth herein.

52.    To the detriment of Ten-X, RRE has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein. RRE has been unjustly enriched through Ten-X's marketing of the Grand Court Villas for sale.

53.    RRE gained access to Ten-X's community of bidders. RRE would not have had such access without obtaining Ten-X's marketing services.

54.     Between Ten-X and RRE, it would be unjust for RRE to retain the benefits attained by its wrongful actions. Accordingly, Ten-X seeks full restitution of RRE's enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.     That a judgment be entered in favor of Plaintiff and against Defendants;

2.     That Plaintiff recover damages, including compensatory and consequential damages, and such other relief as provided by law;

3.     That the Court award prejudgment and post-judgment interest on such monetary relief;

4.     For reasonable attorneys' fees and costs; and

5.     For such other and further relief that Plaintiff may be entitled to at law or in equity.

Dated:  February 1, 2023

CALL & JENSEN
A Professional Corporation
Aaron L. Renfro
L. Lisa Sandoval


By:_____
     L. Lisa Sandoval

Attorneys for Plaintiff, Ten-X, LLC

# EXHIBIT A



# TEN-X MARKETING AGREEMENT

This Ten-X Marketing Agreement ("Agreement") is between Seller and Ten-X, LLC, together with its subsidiaries ("Ten-X"), and is effective as of July 5, 2022 ("Effective Date"). Seller is engaging Ten-X to advertise, market and promote the sale of the Property and Ten-X will include the Property in one or more auction events (each, an "Auction") through Ten-X's website during the Marketing Period. This Agreement is subject to the Ten-X Marketing Agreement Standard Terms located at http://www.ten-x.com/company/legal/txmast10072021 ("Standard Terms").

## I. SELLER AND PROPERTY INFORMATION

| (a) | Seller (legal entity or individual) | Rational Real Estate XII LLC |
|---|---|---|
| (b) | Site Contact | Name: Zachary McHale    Phone: (610) 737-8948    Email: Zach.Mchale@cbre.com |
| (c) | Property | Address: 507 Grand St, Trenton, NJ 08611 |
| (d) | Marketing Period | The _60_ day period beginning on the Effective Date |
| (e) | Tail Period | The _60_ day period beginning the day after the last day of the Marketing Period |
| (f) | Reserve Price | $9,000,000 |

## II. Fees

| (a) | Transaction Fee | **Buyer's Offer Price** **Transaction Fee (% of Buyer's Offer Price)** |
|---|---|---|
| | | $0M to <1M          5.00% ($10,000 minimum) |
| | | $1M to <$3M         3.00% |
| | | $3M to <$5M         2.50% |
| | | $5M to <$10M        2.25% |
| | | $10M to <$15M       2.00% |
| | | $15M to <$25M       1.75% |
| | | $25M to <$35M       1.50% |
| | | $35M to <$45M       1.00% |
| | | $45M to <$55M       0.75% |
| | | $55M and up         0.50% |
| | | *(For a sale facilitated by Ten-X, the Transaction Fee will be added to the buyer's offer price to establish the total purchase price payable by the buyer)* |
| (b) | Withdrawal Fee | An amount equal to the Transaction Fee that would be applicable to a sale at the initial Reserve Price. |
| (c) | Buyer Broker Commission | _____ of the buyer's offer price (exclusive of any Transaction Fee), paid at closing by: _____ |

## III. TRANSACTION DETAILS

| (a) | Listing Broker | Brokerage: CBRE |
|---|---|---|
| | | Name: Richard Gatto    Phone: (201) 712-5803    Email: richard.gatto@cbre.com |
| (b) | Escrow/Closing Agent | Company: Novare National Settlement Services |
| | | Phone: _____    Email: orders@novarenss.com |
| (c) | Title Provider (if different from Escrow/Closing Agent) | Company: Novare National Settlement Services |
| | | Phone: _____    Email: orders@novarenss.com |
| (d) | Purchase Agreement | The purchase agreement to be used in the marketing of the Property will be: |
| | | ☐ **Ten-X's Form PSA** (Ten-X's standard form purchase agreement, available at https://www.ten-x.com/company/psa01012021 with Ten-X's applicable state-specific rider and other Ten-X standard form addenda selected by Seller) |
| | | ☑ **Ten-X's Form PSA, together with Seller's addendum**    (must provide within 10 days after the Effective Date) |
| | | ☐ **Seller's own form purchase agreement**    (must provide within 10 days after the Effective Date) |

## IV. DUE DILIGENCE MATERIALS PROVIDED BY THIRD PARTIES

| (a) | Title Report | ☑ **Ten-X will order title report (or property report or abstract of title) from a Ten-X preferred vendor**; Seller must reimburse Ten-X or the issuer of the report for the cost thereof only if (i) Ten-X earns a Transaction Fee or Withdrawal Fee, or (ii) Seller later selects a different title company for the transaction |
|---|---|---|
| | | ☐ **Seller will provide title report at Seller's own cost**    (must not be more than 90 days old as of the start of the Marketing Period) |
| (b) | Phase I Environmental Site Assessment ("Phase I") | ☑ **Ten-X will order Phase I or, ☐ limited Phase I**; Seller must reimburse Ten-X or issuer of the Phase I for the cost thereof only if Ten-X earns a Transaction Fee or Withdrawal Fee |
| | | ☐ **Seller will provide Phase I at Seller's own cost**    (must not be more than 90 days old as of the start of the Marketing Period) |
| | | ☐ **None** |
| (c) | Property Condition Assessment ("PCA") | ☑ **Ten-X will order PCA**; Seller must reimburse Ten-X or issuer of the PCA for the cost thereof only if Ten-X earns a Transaction Fee or Withdrawal Fee |
| | | ☐ **Seller will provide PCA at Seller's own cost**    (must not be more than 90 days old as of the start of the Marketing Period) |
| | | ☐ **None** |
| (d) | Agency Disclosures | Seller acknowledges receipt of the agency disclosure located at https://www.ten-x.com/company/newjersey/ |

Revised 10072021

Copyright © 2022 Ten-X, LLC. All rights reserved.



## V. ADDITIONAL TERMS

**SELLER**

**Rational Real Estate XII LLC**

By: *Joshua Kahr*
Joshua Kahr (Jul 5, 2022 11:39 EDT)

| | |
|---|---|
| Name: | Joshua Kahr |
| Title: | Managing Member |

Address:    60 S Munn Ave
East Orange, NJ 07018-3512

Email:    josh@kahrrealestate.com

Telephone:    (646) 286-0128

**TEN-X**

By: *Arlene Richardson*

| | |
|---|---|
| Name: | Arlene Richardson |
| Title: | Supervising Broker |

15295 Alton Parkway, Irvine, CA 92618
Attention: Legal Department

legal-notice@ten-x.com

(888) 952-6393

Initials:    *AR*
AR
July 5, 2022



# EXHIBIT B

# TEN-X Marketing Agreement Standard Terms

These Ten-X Marketing Agreement Standard Terms (these "Standard Terms") form a material part of the Ten-X Marketing Agreement (the "Agreement") which references these Standard Terms. All capitalized terms not defined in these Standard Terms have the meanings set forth in the Agreement. In the event of a conflict between the terms of the Agreement and these Standard Terms, the terms of the Agreement control.

## 1. SALE DURING MARKETING PERIOD

If Seller enters into an agreement to sell a Property during the Marketing Period and the transaction closes, Ten-X shall be paid the Transaction Fee from the sale proceeds due Seller upon closing, regardless of when closing occurs. For any Property sale facilitated by Ten-X, the Transaction Fee will be added to the buyer's offer price to establish the total purchase price payable by the buyer. For any Property sale not facilitated by Ten-X, Seller shall provide Ten-X a copy of the applicable purchase and sale agreement, and any amendments thereto, promptly after execution thereof.

## 2. SALE DURING TAIL PERIOD

If Seller enters into an agreement to sell a Property during the Tail Period with a buyer who, during the Marketing Period, whether personally or through the buyer's representatives, registered for an Auction for the Property, accessed the Due Diligence Materials for the Property, or submitted an offer or letter of intent for the Property ("Ten-X Buyer"), and that transaction closes, Ten-X shall be paid the Transaction Fee from the sale proceeds due Seller upon closing, regardless of when closing occurs. For any Property sale to a Ten-X Buyer, Seller shall provide Ten-X a copy of the applicable purchase and sale agreement, and any amendments thereto, promptly after execution thereof.

## 3. WITHDRAWAL

(a) If Seller withdraws a Property from an Auction or the Ten-X website during the Marketing Period (other than in connection with a sale facilitated by Ten-X, or due to a material adverse change to the Property outside of Seller's control that renders it unmarketable), Seller shall immediately pay Ten-X (i) 50% of the Withdrawal Fee if the withdrawal occurs more than 30 days before the start of the first scheduled auction date, or (ii) 100% of the Withdrawal Fee if the withdrawal occurs anytime thereafter. If Seller later closes on the sale of the Property in a transaction in which a Transaction Fee is owed under Section 1 or Section 2 of these Standard Terms, such Transaction Fee shall still apply, but Seller shall be credited any portion of the Withdrawal Fee actually paid to Ten-X, up to the full Transaction Fee.

(b) If the highest offer for the Property is at or above the Reserve Price and Seller rejects it, Seller shall immediately pay Ten-X the Transaction Fee based on that offer.

(c) If Seller enters into an agreement to sell a Property during the Marketing Period and that agreement is terminated for reasons other than (i) a buyer default or (ii) failure of a closing condition not resulting from Seller's default or other circumstance within Seller's reasonable control, Seller shall immediately pay Ten-X the Transaction Fee based on the buyer's offer price in that agreement.

## 4. MARKETING COSTS AND EXPENSES

Ten-X is solely responsible for advertising, marketing and promotion costs Ten-X incurs in performance of the Agreement. Ten-X may include the Property listing and/or the Auction on other websites owned or controlled by Ten-X and its affiliates, including but not limited to CoStar Realty Information, Inc. (through its CoStar or LoopNet brands), at no additional cost to Seller.

## 5. BUYER BROKER COMMISSION

The Buyer Broker Commission set forth in the Agreement is the fee that must be paid upon closing of the transaction to the real estate broker who represented the buyer in the transaction. The Buyer Broker Commission shall be paid at closing by the responsible party.

## 6. LISTING BROKER COMMISSION AND COOPERATION

Except as otherwise set forth in the Agreement, Seller is solely responsible for any compensation owed to the listing broker and any cooperating broker in connection with the Property. Seller agrees to instruct the listing broker to reasonably cooperate with Ten-X and direct all potential buyers to Ten-X's website during the Marketing Period. If the listing broker fails to reasonably cooperate with Ten-X, the Marketing Period may be extended by Ten-X to account for any delay caused.

## 7. DUE DILIGENCE MATERIALS

Within 5 days after the start of the Marketing Period for a Property, Seller must provide to Ten-X (a) the third-party due diligence materials listed in the Agreement, (b) all existing agreements affecting the Property, and (c) all other materials in Seller's possession or control that are reasonably requested by Ten-X or otherwise reasonably necessary to market and sell the Property (collectively, "Due Diligence Materials"). Ten-X may delay or suspend marketing the Property until all Due Diligence Materials have been received, and the Marketing Period may be extended by Ten-X to account for such delay or suspension. Prior to closing, the Due Diligence Materials will be made available to the escrow/closing agent, and to prospective buyers and lenders who agree to keep them confidential. After closing, once the Property is no longer owned or controlled by Seller, the Due Diligence Materials will no longer be considered confidential and may be made available to others. It is Seller's responsibility to make any redactions to the Due Diligence Materials that may be necessary for Seller to protect sensitive third-party information or comply with any third-party confidentiality obligations Seller may have. Seller must promptly notify Ten-X if Seller learns that any of the Due Diligence Materials are or become inaccurate or incomplete in any material respect.

## 8. TERMINATION

(a) Either party may terminate the Agreement for convenience without penalty by giving the other party prior written notice of its intent to terminate, in which case the Agreement will terminate upon the date provided in the notice (except if any Property is in the Marketing Period, the termination date will be extended until the expiration of the Marketing Period).

(b) Any liability incurred, or compensation earned, during the Marketing Period or the Tail Period (including compensation for sale transactions entered into before, but that close after, the expiration or termination of the Marketing Period or Tail Period, as applicable) shall survive the expiration or termination of

the Agreement. Sections 14 – 28 of these Standard Terms shall survive the expiration or termination of the Agreement.

## 9. REMOVAL OF PROPERTY

Ten-X may remove a Property from the Agreement (a) if there is a material adverse change to the Property that renders the Property unmarketable, (b) on or before the 14th day after Ten-X receives the Due Diligence Materials and purchase agreement materials required by the Agreement, or (c) at any time if Ten-X discovers that the Due Diligence Materials for the Property are inaccurate in any material respect. No Withdrawal Fee will be owed by Seller for a Ten-X removal under this Section unless the removal results from Seller's gross negligence, willful misconduct, or breach of the Agreement.

## 10. SCHEDULED AUCTION DATE

Ten-X and Seller agree to reasonably cooperate to determine the Auction date. If Seller and Ten-X mutually agree to include a Property in an Auction after the Marketing Period, the Marketing Period for that Property will automatically extend through the end of that Auction.

## 11. ESCROW INSTRUCTIONS

Ten-X may submit the Agreement to the escrow/closing agent who shall treat the same as an irrevocable instruction to pay, at closing, the compensation due Ten-X under the Agreement from Seller's funds and proceeds in escrow. Ten-X may cooperate with and share any portion of the Transaction Fee or Withdrawal Fee with other duly licensed real estate brokers.

## 12. RESERVE PRICE

Seller may reduce (but not increase) the Reserve Price at any time in Seller's sole discretion.

## 13. OFFER RESTRICTIONS

Neither Seller nor any of its affiliates, nor any of their respective directors, members, managers, officers, partners, employees, representatives or agents, shall enter any offer or bid for a Property on behalf of Seller. Seller authorizes Ten-X to enter bids on behalf of Seller up to the Reserve Price, unless otherwise prohibited by law.

## 14. INDEMNITIES

Each party (as applicable, the "Indemnifying Party") agrees to indemnify, defend and hold harmless the other party, each person or entity deemed to control or to be controlled by such other party, and their respective affiliates, partners, members, shareholders, managers, directors, officers, employees, agents and representatives, against and from any and all losses, liabilities, and damages (including without limitation reasonable attorneys' fees) arising in connection with any action, claim, controversy, proceeding, or investigation relating to this engagement, to the extent imposed or incurred by reason of the gross negligence or willful misconduct of the Indemnifying Party.

Seller agrees to defend, indemnify, and hold harmless Ten-X, each person or entity deemed to control or be controlled by Ten-X, and their respective partners, members, shareholders, managers, directors, officers, employees, agents and representatives, against and from any and all losses, liabilities, and damages (including without limitation reasonable attorneys' fees) arising in connection with any third-party action, claim, proceeding, or investigation related to (a) any agreement between Seller and a third-party listing broker, or that listing broker's acts or omissions in connection with the listing and sale of a Property, (b) any showings of a Property (except to the extent caused by the gross negligence or willful misconduct of Ten-X), (c) the content of any Due Diligence Materials or photographs provided by Seller and (d) any withdrawal of a Property by Seller or breach by Seller of any purchase agreement.

## 15. NOTICES

Any notice given under the Agreement must be in writing and be delivered to the applicable address listed in the Agreement by (a) personal delivery, (b) certified United States mail, return receipt requested, (c) a nationally recognized overnight courier service, or (d) electronic mail. All notices are deemed given upon receipt or upon the date receipt is refused by the recipient, except that notices delivered by electronic mail are not deemed given until acknowledged by the recipient.

## 16. CONFIDENTIALITY

Each party to the Agreement (as applicable, the "Receiving Party"), for itself and its employees and agents, agrees not to disclose to others any confidential or proprietary information of the other party (as applicable, the "Disclosing Party") which may become known to the Receiving Party under the Agreement, except to the extent the Disclosing Party specifically authorizes the disclosure,

or the disclosure of Seller confidential information reasonably results from Ten-X's performance of the Agreement. For purposes of this paragraph, information is not deemed confidential if (a) it is otherwise within the public domain, or (b) the Receiving Party obtained the information from a source (other than the Disclosing Party or its employees or agents) which, to the Receiving Party's knowledge, does not have a duty of confidentiality to any person or entity. Despite the foregoing, the Receiving Party may disclose confidential information to the extent reasonably necessary to defend itself from any threatened or potential claim, or in response to legal process (and the Receiving Party will provide the Disclosing Party notice of the threatened or potential claim or legal process if legally permitted to do so).

## 17. AUTHORITY; NO CONFLICTS

Each party represents and warrants that it is duly authorized to enter into the Agreement and perform its obligations under the Agreement. Each natural person signing the Agreement on behalf of an entity represents and warrants that he/she has the requisite authority to so bind the entity. Except as disclosed in the Agreement, Seller represents and warrants that there are no purchase agreements, purchase options, or rights of first refusal affecting the Property, or other agreements that could reasonably be expected to conflict with Seller's ability to perform under the Agreement. Seller represents and warrants that publication of the Due Diligence Materials and photographs provided by Seller in connection with Ten-X's marketing of each Property will not infringe any third-party rights, and Seller grants Ten-X a non-exclusive, worldwide, perpetual, royalty-free license to use and modify the photographs for any purpose, including for purposes of marketing Ten-X.

## 18. INDEPENDENT CONTRACTORS

The Agreement is intended to create an independent contractor relationship between Ten-X and Seller, and does not create an employer/employee, agency, or partnership relationship between the parties.

## 19. COMPLETE AGREEMENT; AMENDMENTS

The Agreement is the complete and exclusive agreement between the parties with respect to the subject matter in the Agreement, superseding and replacing any and all prior or contemporaneous communications regarding that subject matter. No modifications to the Agreement will be effective unless made in writing and signed by all parties to the Agreement.

## 20. LIMITED LIABILITY

In no event shall any partner, member, shareholder, manager, director, officer, agent, employee, representative or affiliate of any party have any personal liability in connection with the Agreement. Despite anything to the contrary in the Agreement or these Standard Terms, under no circumstances shall any party hereto be liable to the other for, and each party waives any and all rights to claim against the other for, any special, indirect, incidental, consequential, punitive or exemplary damages in connection with the Agreement or any services performed under the Agreement, including, but not limited to, lost profits, even if such party has knowledge of the possibility of such damages. The maximum aggregate liability of Ten-X and the maximum aggregate amount which may be awarded to and collected by Seller (including, without limitation, for breach of any representation, warranty or covenant by Ten-X) in connection with the Agreement shall, under no circumstances whatsoever, exceed 300% of the compensation paid or payable to Ten-X under the Agreement. Ten-X makes no representation or warranty relating to, and shall have no liability relating to, the performance or non-performance of any buyer, or the legal sufficiency or tax consequences of any transaction documents used in the sale of any Property.

## 21. WAIVER OF RIGHT FOR JURY TRIAL

TO THE EXTENT PERMITTED BY LAW, EACH PARTY HERETO, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE AGREEMENT.

## 22. GOVERNING LAW

The Agreement shall be governed, construed, and enforced by the law of the State of California, without regard to its conflicts of law principles. Except as otherwise set forth in the Agreement, to the extent permitted by law, any legal action or proceeding arising under the Agreement must be brought exclusively in the federal or state courts located in Orange County, California and the parties irrevocably consent to the personal jurisdiction and venue therein.

## 23. FURTHER ASSURANCES

The parties agree to execute such other documents and to take such other actions as may reasonably be necessary to further the purposes of the Agreement.

## 24. SEVERABILITY

If any portion of the Agreement is judicially determined to be invalid or unenforceable, that portion shall be deemed severable from the Agreement and the remainder of the Agreement shall remain in full force and effect and shall be construed to fulfill the intention of the parties.

## 25. ATTORNEYS' FEES

If any party must institute legal action to enforce the Agreement, or for breach of the Agreement, the prevailing party as determined by the court in such action shall be entitled to receive actual reasonable attorneys' fees and costs. The prevailing party is the party entitled to recover its costs of suit, regardless of whether such suit proceeds to final judgment.

## 26. NO GENERAL WAIVER

The failure of any party to enforce any provision or resort to any remedy under the Agreement shall in no way affect the right of that party to later enforce any provision or resort to any remedy under the Agreement. Waiver by any party of a breach shall not be deemed to be a waiver of any subsequent breach.

## 27. MISCELLANEOUS

Ten-X's Privacy Statement located at https://www.ten-x.com/company/legal/privacy/ shall apply to any information supplied by the parties in connection with the Agreement. If the Property's marketing materials display photos, images, information, tools, forms or agreements provided by Ten-X or its affiliates, including but not limited to CoStar Realty Information, Inc. (through its CoStar or LoopNet brands) (collectively, "Ten-X Materials"), Seller is granted a limited, revocable, non-exclusive and non-sub-licensable license to use such Ten-X Materials strictly in connection with the active marketing and sale of the Property in accordance with the Agreement and the CoStar Media Rights information located at https://www.costar.com/about/anti-piracy/costar-media-rights-faqs. All other rights to Ten-X Materials are expressly reserved.

## 28. COUNTERPARTS; ELECTRONIC SIGNATURES

The Agreement may be executed in multiple counterparts, and all counterparts shall constitute one agreement binding upon all parties, whether or not all parties are signatories to the original or the same counterpart. Signatures scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of the Agreement, and shall have the same legal effect as original signatures.

**Published on October 07, 2021**